and I would prefer to be in a courtroom here in New Orleans and you all are right across the courtyard from our building so are you in your offices right now? I'm at home actually. Okay. Okay. I'm in my office your honor. Okay. Alright. Well, we would prefer to have you all here in the building but since that's not possible under the current circumstances, we appreciate your participation in this fashion and let me also thank the court staff for establishing this procedure which has been extremely helpful in getting our cases heard. What we want to try to do is make this as close to an in-person oral argument as possible. If you look where Ms. Dufour's image is on your screen, the clock that you would see in our courtroom is right before her and that'll be the official time for law as you present your argument. We have read the briefing that you've provided and sent a lot of the key cases that you've relied upon so if you want to tell your remarks accordingly that's fine but with that we'll go ahead and begin Ms. Rhodes if you'd like to start. Go ahead. Thank you your honor. May it please the court. Good afternoon. My name is Celia Rhodes with the Federal Public Defender's Office and I represent Mr. Beaulieu. This is a rare case in which a pervasive pattern of prosecution was kept and the conduct infected the entire criminal process from start to finish. Rare still, the government agrees. Also exceptional is the almost complete failure on the part of the district court to police that behavior even seeming to approve it at times. At the contempt proceedings below, Mr. Beaulieu's defense was that he declined to testify pursuant to a court order because federal prosecutor Michael McMahon told him he was not allowed to testify truthfully. In the months leading up to trial, Mr. McMahon repeatedly threatened to criminally prosecute Mr. Beaulieu's defense and at trial itself he was permitted to serve virtually unchecked as both prosecutor and witness to these events, testifying throughout to his own version and repeatedly abusing defense counsel Billy Gibbons and witness Cindy Cimino. By my count, there were at least 24 improper outburst questions or remarks during the course of a four-hour trial from opening to closing, which is actually two hours when you exclude the break. So that's 24 instances of misconduct over two hours. It entirely consumes these proceedings. Oh no, that's not true. I'm telling you that's not true. I object because that's a misstatement of fact. I never threatened him. I never threatened him. And even do you think I'm as dumb as I look? Mr. Gibbons objected to these testimonial outbursts on at least three separate occasions, reminding the judge that Mr. McMahon was not a witness and could not testify. One of those objections was expressly overruled at page 1010. Another objection at page 1005 was interrupted by the court. And while the court acknowledged that Mr. McMahon was not in fact a witness, she then suggested that he could testify if he wanted to. And that was the tone set from the beginning. The first time that Mr. McMahon interrupted Mr. Gibbons to accuse him of lying, the judge called a bench conference, but it wasn't to address Mr. McMahon's behavior. She immediately scolded Mr. Gibbons, warning him, quote, Mr. As for Mr. McMahon, she assured him that he, quote, had the record and expressed concern that he might want to, quote, defend what they say, saying, I'll let you do what you want. And that's exactly how this trial proceeded. Only once, well into the trial, did the judge tell the jurors to disregard a single one of Mr. McMahon's 24 improper statements. There was only one curative instruction given. But other than that, the court failed to police this behavior again and again, despite being on clear notice that this was improper. And that was true throughout these proceedings, not just trial. In filing after filing, Mr. Boulier's second counsel, Mr. Marshall, begged the court to address Mr. McMahon's behavior and to remove him. He reported Mr. McMahon's threats and was chastised for doing so, and even attempting to withdraw under threat of federal prosecution. He specifically warned the court, this is not a disinterested prosecutor. Allowing him to proceed will violate Mr. Boulier's right to due process. And he even foresaw exactly what happened at trial, warning the judge that Mr. McMahon had to be removed to preserve the integrity of judicial proceedings because of great risk that the jury will assign too much weight. A pre-trial motion filed with regard to Mr. McMahon serving as both prosecutor and witness before the trial, is that correct? Yes, your honor. So there was objections before trial and during trial. So Mr. Marshall filed a disqualification motion and he made clear to the court, and this is at record page 134, that misconduct was going to be the defense, Mr. McMahon's misconduct was the defense. Was there co-counsel from the U.S. attorney's office or the Department of Justice for this trial, Mr. Boulier's trial, or was it just Mr. McMahon as prosecutor solo? So on the original trial where this issue arose, where Mr. Boulier asserted his I believe was on this, and he made one filing. For this trial, was it just Mr. McMahon prosecuting the case on the trial that we have the appeal from here? So Mr. McMahon, if I recall correctly, submitted at least one response and that was to the recusal motion, but I don't believe that he had any involvement at trial or after that. He doesn't seem to appear in the record after that. So I do believe that, and the government certainly can correct me if they know differently, but the record certainly suggests that this was all McMahon after that initial response. Well, I'm just curious as to the argument with regard to Mr. McMahon, quote, testifying whether or not he could have been put on the stand and been questioned by another prosecutor, whether he's enrolled in the case. Obviously, he's not enrolled in the case. He could be called as a witness. Maybe Mr. Boykman will cover that in his presentation, but insofar as your answer to my question, Mr. Sandman was not in the courtroom as a counsel of record prosecuting attorney for this case, Mr. Bolo's case that he's appealing today. That's my understanding, and I think that the judge's remarks on this point make sense because she seems to be searching the crowd for a prosecutor to cross-examine him. At one point, she says, well, if only we had someone here who could ask you questions, then, of course, you could get on the stand and testify. Now, first, that didn't happen, so it's sort of hard to speculate. Regardless, he wasn't put under oath. He wasn't put on the stand, so there was no opportunity to cross-examine him under oath. That being said, though, I think that the essence of cases like Berger about juries assigning too much weight to prosecutors' remarks would suggest that that would be extremely problematic. There are cases, I think the government cited one, where a prosecutor might testify very briefly about something that is sort of peripheral that comes up as trial occurs, but certainly not to the key factual dispute. I think that even if that had happened, that would have been problematic, which is why it's surprising that the judge suggested it, frankly. I'm glad that you asked about the pretrial motion because I think that it shows that this is sort of a rare case where the issue was preserved not just contemporaneously during trial, but was extensively litigated pre-trial. The district court actually expressly rejected those arguments. In her disqualification order, she, first of all, denied that these threats of prosecution actually constituted threats and suggested that maybe they were okay. She also rejected this idea that Mr. McMahon was an interested witness and would need to testify. At the withdrawal hearing, she also suggested that this doesn't count as testimony. Once again, Mr. Marshall reiterated his opposition to Mr. McMahon serving as prosecutor, saying he's a witness to these events and he's not going to be allowed to get up there and argue this version of events. The judge actually suggested at that hearing, no, I actually think that the counsel is allowed to argue. I'm surprised that Mr. Gibbons continued to object, frankly, because this was affirmatively foreclosed beforehand, too. That being said, he did object three times. All of that is what makes this case an extraordinary outlier, unlike any case that this court has seen before. This wasn't your isolated prosecutorial error of the comment during closing, the improper question, or even multiple improper questions or comments. This was extensive and deliberate misconduct that was so pervasive that it infected the entire criminal process and infected it unchecked without any real cure. In our view, that necessarily renders this trial fundamentally unfair. This is the type of constitutional violation that must result in a new trial. Now, this kind of situation doesn't come up very often, thankfully, but I do think that the Second Circuit's decision in Yokobowitz provides a helpful framework here. That case involves far less extensive prosecutorial misconduct, so not exactly analogous. It was a prosecutor engaging in summation throughout the trial, but the Second Circuit found that the misconduct qualified as a structural defect mandating automatic reversal because it affected the entire framework within which the trial proceeded. The pattern of error materially altered the procedural scheme, and that's what happened here too. Permitting a prosecutor to proceed in this manner, to give his own personal evidence throughout the proceedings, to denigrate counsel and witnesses when their evidence doesn't conform to his own testimony of events, that materially alters the procedural scheme. This trial looks nothing like trials in our disagrees with that approach because the Second Circuit put this type of error on the extreme end of the automatic error spectrum. At the very least, this case falls under Bowen, which also requires automatic reversal. Because as Judge Jones put it, in that case, this was deliberate and especially egregious trial-type error combined with a pattern of prosecutorial misconduct that so infected the integrity of this proceeding that it warrants a new trial, and that's true regardless of whether it substantially influenced the jury verdict. These were isolated missteps that we normally see in these types of cases, and those are Judge Jones's words. Under Bowen, this type of unclassifiable and pervasive error, which is capable of infecting the integrity, the very structure of the entire proceeding, warrants a new trial irrespective of prejudice. So under Bowen, too, automatic reversal is required, even if the court determines that this pattern of misconduct falls somewhere below structural defects on the automatic reversal error spectrum. Now, Bowen, if the court chooses to follow it, that would end the inquiry there because upon a finding of especially egregious serial misconduct, there's no requirement for prejudice. But I think it's worth noting that under Bowen, reversal is required even if the court believes that prejudice is required because, as Judge Jones explained, the question is the extent to which the jury room, and did it influence the verdict? And Judge Jones held that when you have an exceptionally pervasive pattern of misconduct, like that in Bowen and in this case, and combined with that with the unique position of prosecutors in the minds of jurors, influence on the verdict is, quote, inescapable. So that satisfies the prejudice inquiry under Bowen's framework if this court chooses to reach that question. But as to prejudice, I think that the record needs some clarification on that point because the government suggests repeatedly in their brief that guilt was unchallenged in this trial, and that's absolutely incorrect. And really good evidence of that is despite Mr. McMahon's best efforts, the jury deliberated almost two hours. That's double the amount of time that the witnesses were even on the stand. And they also asked two questions directly relevant to Mr. McMahon's threat and an inaccurate 302. So I would urge this court to the government's argument that Mr. Beaulieu wasn't entitled to a fair trial because the jury necessarily was going to find him guilty. That certainly isn't what the record suggests. So, again, the court doesn't even need to reach this point because under Bowen, this is a pervasive pattern of prosecutorial misconduct that requires automatic reversal. But even under strict compliance with the government's urge framework, reversal is still the result. Now, the court could bypass all that analysis because there are two alternative paths that also lead to reversal. And I'll talk very briefly about disqualification. It was an abuse of discretion for the judge to refuse to disqualify Mr. McMahon. And this is beyond mere appearance of impropriety found in Young. Here there was concrete evidence that Mr. McMahon avidly and not disinterestedly pursued Mr. Beaulieu's conviction. And that's demonstrated by his egregious serial misconduct both before and during trial. It was specifically aimed at vindicating his own personal interest as the judge put it, defending against what they're saying. And under Young, that's what disqualification is supposed to avoid, injection of personal interest in the enforcement process. These actions revealed an almost rabid personal interest in the evidence presented at trial. And we can't have confidence in the fairness of these proceedings as a result. And that's why defense counsel thought to have Mr. McMahon removed in the first place. Mr. Marshall repeatedly urged that removal was mandated in motion after motion and even made a final plea at his withdrawal hearing. He specifically warned that this is an interested witness to key events of this case. He has a personal stake in them. And he vehemently and personally disputed defense's version of events to the extent that he threatens them with prosecution if they dared present their version. And not only was that an abuse of discretion, but that has constitutional implications as well. As Mr. Marshall explicitly warned that it would, failure to remove Mr. McMahon resulted in further denial of due process. Mr. Beaulieu was deprived of the right to an independent and disinterested prosecutor, and he was subjected to a trial in which the prosecutor served as the key witness, unchecked and uncross-examined against him. And I see that I only have a minute left. If there aren't any questions, then I'll allow the government to respond. So you're seeking that we reverse this conviction and it be remanded for retrial? Yes, your honor. I certainly think that there's a good argument that this requires dismissal entirely, which perhaps would be a motion that would be filed upon remand. That being said, I haven't raised it on appeal because Mr. Gibbons, I think likely due to the futility of it, but I do think that upon remand for a new trial, we certainly would be at least looking into the possibility of dismissing for prosecutorial misconduct. Okay. Thank you. Mr. Boydman, you have 20 minutes. Thank you, Judge Engelhardt. Good afternoon, your honors. May it please the court. Your honors, I'm not here to defend the conduct of the prosecutor in this case. The court, the defendant, and the public certainly have a right to expect better. Expect high-class professionalism. We fell short of that in this case. We acknowledge that. But the presence of misconduct does not mandate reversal. It's not structural error. This court has routinely analyzed and evaluated cases of prosecutorial misconduct in light of the whole record, in light of the whole case, and considering different factors of analysis. That's all we're asking the court to do today, is to do its traditional framework, its routine framework, to see how this, if it did, in fact prejudice Mr. Bolio. And looking at that in light of the record, it doesn't. Mr. Bolio was not prejudiced here, despite the misconduct. And as such, the court confirmed the conviction. Judge Engelhardt, just to clarify, you asked if Mr. McMahon was the only attorney for the 10-10 trial. He was the only attorney that prosecuted the case. So during the trial, it would have been Mr. McMahon and Mr. McMahon alone. And looking at the conduct of that case, this court has always identified things in a two-step process. Is there misconduct? And was the defendant prejudiced? We acknowledge the misconduct. So the question is, was the defendant prejudiced? Contrary to what opposing counsel is asking, this court very rarely, if ever, looks to a possibility of structural error or automatic reversal. Instead, it analyzes the defendant was prejudiced, basically by looking at the strength of the evidence, the efficacy of the instructions, and the magnitude of any misconduct. So can we stop right there for a second? I'm hung up on the strength of the evidence. So think about this hypothetical with me for a second. Suppose an assistant United States attorney is out in the French Quarter one night and sees a drug deal go down. Or at least says he sees a drug deal go down. And then is the sole prosecutor on whether and to what extent the defendant was passing drugs or accepting money in exchange for drugs. When we get to the prejudice question, the fact that that AUSA is testifying as a fact witness 24 times, as your friend on the other side pointed out, that is prejudicial because it goes to the facts that are put in front of the jury. You've got the AUSA talking about what he saw, what he thought, what is true, what's a lie, who was where. Call it structural error, call it prejudice. I understand, obviously, the legal distinction, and I agree with you that it's an important one. But it's really hard to understand how you don't find prejudice where the AUSA is talking about the facts of who said what in these conversations about the immunity. Sure. I understand, Your Honor. And I think, Judge Oldham, it goes into some other issues that we talked about is let's focus on what the misconduct was about and what it was related to. Because I think with the one exception of the statement in closing argument about don't return a verdict, don't insult the district judge with a not guilty verdict, I think if you'll take a look, all the misconduct related to the defense theory of why Mr. Beaulieu chose not to testify. In fact, that the prosecutor had threatened him with perjury. And this goes into where we're talking about that that defense is really an irrelevant defense. This court, the cases we talked about with defendants who have refused to testify after grants of immunity, mostly in grand jury context, but they're there. And whereas people have said, in Brumman, for example, I fear further prosecution, even though I have immunity. Or other cases we talked about where I feel reprisal. I fear that someone's going to come after me. I fear that my family might be in danger. The courts have said, the reason you choose not to testify is not relevant in this context. If you're ordered to testify and you willfully decide not to testify, it doesn't matter what your reasons for doing so are. That is the element. So our argument here is that the misconduct related to this irrelevant defense. And to clarify what opposing counsel mentioned when we said the ideas of guilt were contested, opposing trial counsel, not opposing counsel, but trial counsel, Mr. Billy Gibbons, told the jury on several occasions, we don't dispute that there was an order to testify. We don't dispute that he chose not to testify. What we're disputing is why he didn't testify. But that is motive. And motive is not a relevant defense. So I think when you look at the prejudice, you've got to look at the fact of what was the misconduct related to. Now, in the hypothetical you talked to, Judge Oldham, I think that a prosecutor seeing drugs change hands in a drug distribution case, if he's testifying about that, that's going to relevant facts. This was not. The misconduct here was not part of the government's case in chief. It came up through the defense theory. And the biggest part of it was in the rebuttal close and response to trial counsel's closing argument and in the cross-examination of Ms. Samina on those issues. And it was solely related to, let me tell you why I didn't do it. That's not a good faith defense, where it's not Mr. Bolio saying, I thought I was in good faith. I thought I complied with the order. I thought I followed the order. It wasn't that. This was, I had immunity. I was told to testify. I chose not to testify. But let me tell you why. That's not a good faith defense. That's an improper motive defense. So I think the reason the prejudice doesn't go there, Your Honor, is because the misconduct was related to that irrelevant defense. And in a way, that's not any different than what this court normally does in other contexts. For example, if this court were on sufficiency of the evidence review, and let's say the prosecution had introduced improper 404B evidence and used it as propensity, that would be a violation of the rules of evidence in due process. Let's say they also introduced an unconstitutional testimonial hearsay statement in violation of Crawford and the Sixth Amendment. This court certainly could find that those were big errors, but then it would still analyze it in light of the other evidence to say, was it harmless? And that's what you can do here. And I think that's why the importance of the language in Jones, that was more than 30 years ago, is right. That even if there's, even if you think reversal for a new trial would be the most effective way to sanctions misconduct, the court should only reverse conviction when it's clear that the error cast doubt in the jury verdict. And where a reviewing court can find that the record developed at trial establishes guilt beyond a reasonable doubt, the interest in justice has been satisfied and the judgment should be affirmed. That's all we're asking the court to do here is take a look at that analysis. Mr. Boyden, pardon me for interrupting, but I think that when we see the, I believe it was 48 instances pervading this whole trial and what hasn't been discussed, the way they were, the objections were handled by the district court. How can this court not clean up this mess by ordering a new trial possibly before a different judge? Sure, your honor. Well, well, first of all, I would take a look at the objections and I kind of disagree with opposing counsel that the fact that trial counsel may have lost some motions eliminate, set the thing in motion to where every other objection at trial would be futile. You have several, I think we looked at it at the 10 objections, six of them went the way of the defendant. The government objected and was overruled at one time when Mr. McMahon told Ms. Cimino in cross-examination, I'm telling you that's not true. The defense objected, the objection was sustained and the statement was stricken from the record. So I'm not convinced that just because there was a motions eliminate went against someone that that meant the trial judge didn't police it correctly. I certainly think trial counsel is a very good trial counsel, knew how to object and knew when to object and could have objected more if needed. But I still think it comes down to look at the evidence. Aside from that, and even if the judge should have granted more or should have stepped in more, I think you still come down to the basic analysis that you do and not automatically assume error like opposing counsel has recommended, which is the only argument they've really presented. Mr. Bognett, what was the totality of the evidence submitted for this conviction? And I have another question for you about the underlying proceeding, but in this, since you just mentioned it, who all was called as a witness? It's a very short trial. And as you say, the elements of the offense, the criminal contempt are fairly simple. What evidence did the government put on in its case in chief? Sure. The, uh, the government called the FBI agent who had investigated the underlying Winans-Tuzno robbery trial. And he had been one who took the FBI interview of Mr. Bolio in this summary of Mr. Bolio's statement was put, was placed in evidence. A copy of the immunity letter from the department of justice that was given for Mr. Bolio was placed in evidence. The transcript from the Winans-Tuzno trial in which the district court ordered Mr. Bolio to testify and made sure that he recognized he could be held at contempt if he didn't testify, that was also placed in supports guilt that there was a reasonably specific order issued that Mr. Bolio was ordered to testify and that he chose not to do so. And additionally, if the dispute, as I understand it, maybe Ms. Rhodes will come back to this in her rebuttal, because I'm asking both of you the dispute. And I understand your argument about how it's not relevant. The motives for not testifying is not relevant, but isn't, isn't the, the complaint that once Mr. Bolio gets immunity, the government provides a letter, it's immunity for the offense that he's going to testify about and his participation in it. Is that correct? The argument as I understand it is that, put that aside, he didn't testify because Mr. McMahon said, when you get on that witness stand, you better darn well say X, Y, and Z, or I'll prosecute you for perjury or what have you. Isn't that the rub on this thing? That's the argument, your honor, in that if, as opposing counsel stated, if Mr. Bolio would have testified differently from the 302, he would have been prosecuted. Now, your honor, one, the exact statements of that have not been identified. I can't point to the record, any findings, specifically the exact words. But certainly, in any case, right, when the government has a statement of some sort, whether it's a 302, or a recorded statement, or grand jury testimony, or what have you, the government, though it rarely does so, at least in my experience, can always prosecute a cooperating witness who testifies falsely or directly contrary to prior testimony under oath. Isn't that the case? That's correct, your honor, because no immunity statement can give you immunity to lie in the future. And that's the point. And I think everybody would agree with that. If Mr. Bolio got on the stand, even with immunity, and lied during the Wine Institute's no trial, that would have been a problem, if he would have lied about some material event, and that was a big issue. But I think the thing is here, Mr. Bolio was immunized as much as he could be. The only thing he was going to be having problems were, is if he lied on the stand at the Wine Institute's no trial. Now, he could have said something different. He could have said, I said this before, that was wrong. He could have explained why there'd be a difference. But the thing is, you're not allowed to disobey in order to testify. And that's why the evidence in this case is so straightforward and so simple, and why really the prejudice, if any, is minimized to this offense. Because it was very clear, there was a reasonably specific order to testify. There was an order to testify. He had immunity, and he chose not to. And that is contempt. And I want to tell the jury why I didn't do it. That's not relevant. And that's what the misconduct was related to. So I think you have to take that into consideration when looking to this is a reversible error. Now, the opposing counsel mentioned two cases, the Yakobowitz case at the Second Circuit in Bowick. First of all, the Yakobowitz case, I'm not positive that that's actually a prosecutorial misconduct case. I may be wrong on that, but my understanding of that one is that the judge just allowed a procedure to come into trial, where after each witness, the prosecutor was allowed to give basically a summation of that witness and argue it to the jury. The court found that that affected the presumption of evidence, it upset the natural orders of trial, the criminal trials as we know it, and allowed the jury to start forming opinions before the case was submitted to them, and really put the defense on a position of, I cannot now rely on my presumption of innocence. I may have to respond. You don't have that situation here. There wasn't a summation after the government's witness. And in fact, at that point, there wasn't a presumption of innocence. Well, there was a presumption of innocence, but the defense didn't rest on that. They actually put a case on and put Miss Amin on the stand. So it's not the same thing. And as far as Bowen, this case is not Bowen for at least three reasons. One, the facts in Bowen's, as this court noted, were very novel and exceptional. It involved blogging incidents, anonymous blogging, hundreds of them, if not more, from members of the U.S. Attorney's Office and the Department of Justice that were not part of the trial team, and therefore attacking the structure of the trial from outside. It wasn't the misconduct that occurred within the trial. It was conduct that occurred without. And in fact, this court mentioned that the commenting alone, which breached all standards of professional ethics, gave the government assertitious advantage in influencing public opinion, the veneer panel, and the trial itself. And also, because the new-to-be misleading omissions, and in some instances, lied directly to the court, the district court couldn't uncover the extent of the prosecutor's transgressions. That's not what you have here. All the error that occurred here happened in the court. So that's the one thing that's novel and exceptional differences. The second difference from Bowen is that the misconduct here is quantifiable. And as the court in Bowen made sense, or made a point of stating, quoting the Supreme Court's decision in Breck, when the misconduct occurs during the presentation of evidence, it's ordinarily quantifiable and amenable to harmless error analysis. All the misconduct that really affected the trial here happened in the presentation of evidence. And so you can quantify that and look at it in light of the other evidence. But the third most important difference here is the procedural posture that this case is in, in light of Bowen. This court in Bowen did not reverse the conviction. The district court in affirmed that decision, finding that the district court had not abused discretion. The same blogging incident, or most of the same blogging incident that was the underlying problems in Bowen, were also present in United States v. McCray, United States v. Broussard, and United States v. Rene Gilkrab. And in all three of those cases, this court affirmed the district court's denial of vacating the conviction and granting relief in that situation. So this is Bowen did not find in the first instance that the conduct in the Bowen case must have been granted a new trial. It simply found that the district court did not abuse its discretion in granting the new trial. So that's a difference here. In this procedural posture, who bears the burden of proving prejudice? The defendant does, Your Honor. And I believe that is whether it's on plain error or preserved. And we have the cases in there, but this court has stated that a defendant bears a substantial burden to show that misconduct prejudiced this conviction and undermined confidence in the verdict. So even after you've confessed that there was an error? Well, what we confess is that there was in fact prosecutorial misconduct. We agree, we're not challenging that. But we do not concede that it prejudiced error. And in fact, in looking at the case that was presented that opposing counsel brought, the only argument they brought forward is that the amount of misconduct mandates reversal and is akin to structural error. We cannot concede that because that is not what your case law says. It says the defendant bears a substantial burden to prove prejudice and to prove the underlying misconduct. Here in light of everything, we don't think the defendant has proven that because it's not the case they presented and they actually haven't made a prejudice analysis. But even if you would look at it alone, even though that's not what they brought, but even if you would look at it alone or look at it here, we still think that because of the irrelevant defense, because that was the relation of it, especially, and because of the clear, simple evidence of contempt here that you can affirm for that basis. One of the elements that the government had to prove at the second trial, the convent trial, would be willful intention to violate the court order. It's a third requirement of contempt. Right. That there was an order, that there was a reasonably specific order, it really comes down to a willful violation of it. Right. An order, a violation that was willfully, the defendant willfully intended. Right. And I think it says contemptuously or contemptuously, but willfully, basically deliberately is what it comes out to. And that's what you have here. And the defense admitted as saying that, we don't deny he chose not to testify. And I think we have chose not to testify is the words that counsel did. We did that through the order to testify and Mr. Polio's failure to testify after being, after being the colloquy with the district court in the Winan-Stewart no trial. And that was, that was introduced in evidence. And I think that's willful evidence of disobedience. And it obviously would be a very different case. These performances by the AUSA happened during the trial, which is public. And the rulings by the court were public. Don't we have an obligation when something is so erroneous as this was, and it's shown to the public to erase that, to show that we will not stand for it. I think Judge Wiener, you can make that point clear. I think you can make that point saying you're, you're expressed disagreement and disbelief with the conduct. But I still think your case law says we don't reverse just for the blunders of the constable. I think it routinely says we look to see the fairness in the verdict and where this court has said, if the record developed, the trial establishes guilt beyond a reasonable doubt, the interest in justice has been satisfied and the judgment should be affirmed. And that's all we're asking you to do is use that balance. And I see that my Mr. Boydman. Yes, your honor. Judge Oldham or Judge Wiener, any other questions for Mr. Boydman? Okay. Ms. Rhodes, you have five minutes of rebuttal time. Thank you, your honor. I want to touch definitely on that willfulness question, but first I want to clarify the record on what the district court did to intervene. Mr. Boydman talked about a number of objections by the government that were overruled, but those were Mr. McMahon's objections saying I object because that's not true. And at least one of the curative instructions that the government points to is actually directed at Mr. Gibbons. So Mr. Boydman, I apologize, not Mr. Boydman, Mr. McMahon objected that's not true. She overruled that, but she gave a curative objection to satisfy him saying I'm going to overrule this. The jury's instructed essentially what Mr. Gibbons doesn't say, what Mr. Gibbons says is not, is only argument, not evidence. So it's curing the opposite direction. I think actually doing the opposite of what Mr. Boydman might have been suggesting it was doing. And so I think scouring the record myself, I've only seen one actual cure. And that was one point it was when Mr. Gibbons objection was sustained and she simply instructed the jury to disregard one of the 24 remarks. I also, the government is urging application of sort of routine traditional case law, but this is not a routine traditional case. And that's why Judge Jones and Bowen rejected this framework and called upon Brecht. And I want to just very quickly clarify that Brecht, Judge Jones talked about sort of the inability to determine prejudice because the government had obstructed the investigation. And she called upon that with sort of inability to measure harmlessness. That's actually a structural error factor. The idea that structural errors are to determine the extent. Brecht is very specifically about internal trial errors. So Brecht held that usually trial errors are not going to require automatic reversal, but the exception to that is hybrid error, where there is a trial type error in an unusual case with deliberate and especially egregious misconduct, a pattern of misconduct. And that's exactly what happened here. An internal trial error combined with a pattern of misconduct. Now to the willfulness point, the government has said repeatedly in a briefing and now that this was a motive defense. But I think that Mr. Gibbons' argument on page 1025 of the record really clarifies, this is a willfulness defense. The government has the burden of proving willfulness. And Judge Inglehart, to your point, there was very little affirmative evidence to the jury to assume willfulness just on the basis that there was a court order, he knew about it, and he didn't comply. But willfulness requires more than that. And so that was his argument to the jury. And actually Mr. Gibbons moved for acquittal after the government's case on the basis the government didn't affirmatively prove willfulness. So Mr. Gibbons certainly didn't believe that the evidence was overwhelming. But willfulness requires that the government approve deliberate or an intended violation as distinguished from an accidental inadvertent or negligent violation. And under Allen, that means that the government has to show both a contentious act and a willful or reckless state of mind, meaning a gross deviation from what a reasonable person would do. And again, I don't think this court needs to reach that point because Judge Oldham, as you were saying, I think that in a case like this, as Judge Jones recognized, of course this was prejudicial. You have a prosecutor testifying to the key events in the case. And that's what Judge Jones found too. Of course, it is just unimaginable that this wouldn't have infected the jury room. But even if the court determined this is a routine, traditional misconduct case, we're going to require stripped prejudice. Essentially, we're going to impose an actual innocence standard where we have to be convinced that this person wasn't guilty. Even then, this was the defense that Mr. Beaulieu was permitted to present by the district court. The government didn't object below, and I think for good reason. Because his argument wasn't, I wanted to lie on the stand. His argument was, I wanted to tell the truth. It's the opposite. He didn't want a license to lie. He wanted a license to tell the truth, which is what true immunity is. You don't have to fear telling the truth because you're immunized from the consequences. But he reasonably believed that he was not actually immunized. Because Mr. McMahon was saying, if you get up there and you tell the truth, I'm going to prosecute you. You're not given a license to lie in that you cannot be prosecuted for perjury. But you also can't be prosecuted for false statements made in the past, which was also a threat that Mr. McMahon was relaying to Ms. DeNino. I think it was reasonable in these circumstances for Mr. Beaulieu to believe that he was not truly immunized, which is a good faith defense to the willfulness element of contempt. If the court doesn't have any other questions, we would just urge the court to reverse Mr. Beaulieu's conviction in front. I've got a question for Mr. Boyd. When we learned that Mr. McMahon is no longer with the U.S. Attorney, do you know personally whether, and you may not, whether he resigned or was fired? My understanding, he resigned. He was not fired. He resigned of his own accord. Okay. Thank you. Any other questions for either counsel? All right. Thank you all very much for your presentations and for your briefing. The court will take the matter under advisement and render a decision in due course. And with this, the conclusion of this argument, the oral arguments for this panel